UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF NEW HAMPSHIRE

<u>Archdiocese of San Salvador
and Archbishop Fernando
Saenz Lacalle</u>

     v.                         Civil No. 05-cv-237-JD
                                 Opinion No. 2006 DNH 022

<u>FM International, LLC et al.</u>

O R D E R

     The Archdiocese of San Salvador and its Archbishop
(collectively, the "Archdiocese") have brought this action to
recover more than $1 million in disaster relief funds allegedly
misappropriated by the defendants, who include a New Hampshire
limited liability company, two of its managers, and its reputed
agent, Mauricio Coronado.  The company, FM International, LLC
("FMI"), and the managers, Thomas D. McCarron and Gary Friedrich,
together with another corporation formed by Friedrich and named
as a defendant, Foreign Motors of Durham, Inc. (collectively, the
"moving defendants") have moved to dismiss the Archdiocese's
complaint on statute of limitations grounds.  In the alternative,
the moving defendants seek dismissal of the Archdiocese's fraud-
related claims because the Archdiocese has not pled them with the
requisite particularity, Fed. R. Civ. P. 9(b), and dismissal of
two other claims for failure to state a claim for relief, Fed. R.
Civ. P. 12(b)(6).

     The Archdiocese has objected to the motion in its entirety;
the moving defendants have filed a reply to the objection; the

Archdiocese, with the requisite leave of court, has filed a sur-reply.[1]  Coronado, who was incarcerated in Guatemala at the commencement of this action, did not join in his fellow defendants' motion or otherwise respond to the complaint and has subsequently been defaulted.

Background

The complaint alleges the following facts.  Coronado approached representatives of the Archdiocese in early 2002, in the midst of their efforts to raise funds to assist the victims of a recent earthquake in El Salvador.  He "stat[ed] that he represented FM International, a company registered in the state of New Hampshire."  Compl. ¶ 14.  FMI, a self-described "finance and procurement company," id. ¶ 12, had in fact appointed Coronado as "its exclusive legal representative for all of Central and South America, excluding Ecuador" in August 2000. Id. ¶ 13.  This was accomplished through a letter of appointment giving Coronado "full authority to transact business and issue contracts in the name of [FMI]."  Id.  The company also gave Coronado signatory power over its account at Olde Port Bank in Portsmouth, New Hampshire, which later became Granite Bank.

Coronado told the representatives of the Archdiocese about

---

[1]The Archdiocese also requests oral argument on the motion in accordance with L.R. 7.1(d).  The request is denied.

"a program to increase the funds available for disaster relief, including food aid, by a factor of 10"--if the Archdiocese provided FMI with $500,000, it would receive $5 million to use in aid.  Compl. ¶ 14.  On February 28, 2002, a delegation from the Archdiocese met with Coronado and McCarron in Miami, Florida.  At that meeting, the Archdiocese agreed to wire $500,000, to the account of FMI at Granite Bank in Portsmouth.  The Archdiocese wired the money that same day.  It also paid Coronado personally for $40,000 in fees he demanded.

Either at that meeting, or at another one the next day, also in Miami, "representatives of the Archdiocese were advised by associates of . . . Coronado that another country had decided not to enter into the 'program' and, therefore, that another $5 million was available to the [Archdiocese] if [it] could produce another $500,000."  Compl. ¶ 16.  The Archdiocese did so, wiring another half million dollars to FMI's Granite Bank account on March 1, 2002.  The complaint does not relate any other details of this meeting or meetings, aside from the fact that "the Defendants stressed the need for confidentiality concerning the proposed transaction and asked that the lead representative of the Archdiocese sign a . . . document written in English, which mandated secrecy."[2]  Id. ¶ 15.

---

[2]The complaint does not say whether the Archdiocese ever signed this document.

The Archdiocese alleges that its representatives "were led to believe that the $10 million owing under the agreement would be received within one month." Compl. ¶ 17. Sometime in May 2002, after at least two months had passed and the money had yet to materialize, a contingent from the Archdiocese traveled to Miami, presumably in search of Coronado. Though he was not in town, Coronado agreed over the phone to meet the archdiocesans in Buenos Aires, where they subsequently headed. Coronado "explained to the representatives of the Archdiocese that he was presently negotiating a bank guaranty with Banco de Brasil, and that the Archdiocese would receive its money when the bank guaranty was negotiated." Id. When the delegation returned to El Salvador, Coronado wrote to the Archbishop, "saying that the 'program' had been delayed for various reasons," but with "a promise . . . that the money would be forthcoming." Id.

In early July 2002, while Coronado was visiting El Salvador, an official at a local bank alerted the Archbishop "that a bank guarantee from the Banco de Brasil presented by Coronado was not authentic." Compl. ¶ 18. The Archbishop, who had still not received the promised funds, then reported Coronado to the local authorities. He was arrested and charged with fraud. Nevertheless, "Coronado continued to maintain and represent to the Archbishop that the funds would still be forthcoming, assuming [he] would only cooperate in securing [Coronado's]

4

release from prison." Id.

The Archdiocese learned in 2003 that the defendants had begun to draw down the funds in the Granite Bank account "within days" after its $1 million was deposited there in March 2002. Compl. ¶ 19.  The complaint alleges that, over the next few months, "[t]ransfers totaling approximately $999,000, were made to and by . . . Coronado, McCarron, Friedrich, FM International, and Foreign Motors" so that only about $1,000 remained in the account by the end of July 2002.  Id.  The Archdiocese, which never received any of the promised money, commenced this action against the defendants on June 30, 2005.

The complaint asserts six numbered counts against the defendants:  (I) breach of contract, (II) fraud, (III) common-law conversion and violation of Florida's "civil theft" statute, Fla. Stat. Ann. § 772.11, (IV) violations of both the Florida and New Hampshire consumer protection statutes, id. § 501.204 and N.H. Rev. Stat. Ann. ("RSA") § 358-A:2, (V) replevin, and (VI) civil conspiracy.  Each count separately alleges that "[b]ecause . . . McCarron and Friedrich failed to follow corporate formalities, and to observe the separateness of . . . [FMI], and because that corporation existed as a sham to further the fraudulent activities of its principals, . . . McCarron and Friedrich are liable individually and collectively for any liability . . . by [FMI]."  Compl. ¶¶ 23, 27, 31, 34, 37, 41.

5

<u>Standard of Review</u>

"'A complaint should not be dismissed unless it is apparent beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief.'"   <u>Greene v. Rhode Island</u>, 398 F.3d 45, 48 (1st Cir. 2005) (quoting <u>Conley v. Gibson</u>, 355 U.S. 41, 45–46 (1957)).   In ruling on a motion to dismiss under Rule 12(b)(6), then, the court's "task is not to decide whether the plaintiff ultimately will prevail but, rather, whether he is entitled to undertake discovery in furtherance of the pleaded claim[s]." <u>Rodi v. S. New England Sch. of Law</u>, 389 F.3d 5, 13 (1st Cir. 2004) (citing <u>Scheuer v. Rhodes</u>, 416 U.S. 232, 236 (1974)).   Furthermore, the court must "assume the truth of all well-pleaded facts and indulge all reasonable inferences that fit the plaintiff's stated theor[ies] of liability."   <u>Brown v. Credit Suisse First Boston LLC</u> (<u>In re Credit Suisse First Boston Corp. Analyst Reports Sec. Litig.</u>), 431 F.3d 36, 45 (1st Cir. 2005) (internal quotation marks omitted).

<u>Discussion</u>

I.   <u>Whether the Statute of Limitations Bars the Claims</u>

The moving defendants seek to dismiss all of the Archdiocese's claims because they are barred by the statute of limitations.   In accordance with the standards for deciding Rule 12(b)(6) motions, <u>supra</u>, a court can grant a motion to dismiss on

limitations grounds only "'when the pleader's allegations leave no doubt that an asserted claim is time-barred.'"  Centro Medico del Turabo, Inc. v. Feliciano de Melecio, 406 F.3d 1, 6 (1st Cir. 2005) (quoting LaChapelle v. Berkshire Life Ins. Co., 142 F.3d 507, 509 (1st Cir. 1998)); see also Rodi, 389 F.3d at 17.

In New Hampshire, "[e]xcept as otherwise provided by law, all personal actions, except actions for slander or libel, may be brought only within 3 years of the act or omission complained of . . . ."[3]  RSA 508:4, I.  The statute also incorporates the common-law discovery rule, however.  Dobe v. Comm'r, N.H. Dep't of Health & Human Servs., 147 N.H. 458, 461 (2002).  Accordingly,

> when the injury and its causal relationship to the act or omission were not discovered and could not reasonably have been discovered at the time of the act or omission, the action shall be commenced within 3 years of the time the plaintiff discovers, or in the exercise of reasonable diligence should have discovered, the injury and its causal relationship to the act or omission complained of.

RSA 508:4, I.  Under this framework, "once the defendant establishes that the cause of action was not brought within three years of the alleged act, the burden shifts to the plaintiff to raise and prove the applicability of the discovery rule . . . ."  Perez v. Pike Indus., ___ N.H. ___, 889 A.2d 27, 29 (2005).

Based on the Archdiocese's allegation that "the $10 million

---

[3]The Archdiocese concedes, for purposes of the motion to dismiss, that the New Hampshire statute of limitations applies. See Keeton v. Hustler Magazine, 131 N.H. 6, 13-14 (1988).

owing under the agreement would be received within one month,"
Compl. ¶ 17, the moving defendants assert that the limitation
periods on the Archdiocese's claims for breach of contract,
fraud, and conversion began running in April 2002, one month
after the Archdiocese handed over its money.  The court will
address the moving defendants' argument as it applies to each of
the claims in question.[4]

A.   The Contract Claim

The limitations period on a contract claim begins running at
the time of the alleged breach.  A & B Lumber Co v. Vrusho, 151
N.H. 754, 756 (2005); Bronstein v. GZA GeoEnvironmental, 140 N.H.
253, 255 (1995).  The Archdiocese does not seriously dispute the
moving defendants' contention that the breach of the parties'
alleged agreement occurred more than three years before the
commencement of this action on June 30, 2005.[5]  Instead, the

---

[4]Although the moving defendants state in the body of their
motion that the statute of limitations also bars the
Archdiocese's other "common-law claims," i.e., for replevin and
civil conspiracy, as well as its consumer protection claim, Mot.
Dismiss ¶ 7, the motion and its supporting memoranda do not offer
any argument to that effect.  The court will therefore disregard
the moving defendants' unsupported contention that the statute of
limitations bars the Archdiocese's consumer protection, replevin,
conversion, and conspiracy claims.  See Higgins v. New Balance
Athletic Shoe, Inc., 194 F.3d 252, 260 (1st Cir. 1999).

[5]In a footnote in its memorandum in opposition to the motion
to dismiss, the Archdiocese states that "[w]hether the 'program'
in fact required payment within one month, as asserted by moving

Archdiocese argues, <u>inter alia</u>, that it "did not discover the potential injury caused by any Defendants' [*sic*] bad acts until July 2002 at the earliest, when the Archbishop first learned that the bank guaranty peddled by them was not genuine."  Mem. Opp'n Mot. Dismiss at 8.  Because this revelation occurred within the limitations period, the Archdiocese maintains that its contract claim is timely by virtue of the discovery rule.

The New Hampshire Supreme Court has held that the discovery rule applies to both tort and contract actions.  <u>Black Bear Lodge v. Trillium Corp.</u>, 136 N.H. 635, 638 (1993).  Under the rule, the limitations period on a contract claim does not commence until the plaintiff knows, or reasonably should have known, both that the defendant breached the agreement and that the plaintiff suffered harm as a result.  <u>Coyle v. Battles</u>, 147 N.H. 98, 101 (2001); <u>see also</u> <u>Wood v. Greaves</u>, 152 N.H. 228, 232 (2005).  The moving defendants argue that the Archdiocese was aware of both of these facts by April, 2002, when the money failed to materialize in accordance with the terms of the alleged contract.

The court agrees.  According to the complaint, the agreement required the defendants not only to produce $10 million, but to

---

defendants, remains uncertain," particularly because the alleged agreement was never reduced to writing.  Mem. Opp'n Mot. Dismiss at 12 n.5.  The complaint affirmatively alleges, however, the Archdiocese's belief that "the $10 million owing under the agreement would be received in one month."  Compl. ¶ 17.  As noted <u>supra</u>, the court must accept the facts the Archdiocese has alleged in the complaint as true in ruling on the motion.

produce it within one month of receiving the Archdiocese's $1 million investment.  Once that time had passed and the defendants had failed to do so, they were in breach of the agreement.[6]  The subsequent dispatch of the delegation to Miami and Buenos Aires in search of Coronado indicates the Archdiocese's appreciation of both the breach and its resulting harm in depriving the Archdiocese of the timely use of the promised funds.  See Coyle, 147 N.H. at 101 (commencing limitations period on claim for excessive attorneys' fees at point plaintiffs demanded refund).  Thus, while the Archbishop's discovery that the bank guaranty was phony in July 2002, might have suggested that he would never receive the $10 million, it did not contribute to his awareness that he had not received the money at the time it was due, in April 2002.  The discovery rule therefore does not save the contract claim from the statute of limitations.[7]  See Fuller

---

[6]Under New Hampshire law, a promisor's failure to remit payment by the time specified in a contract does not necessarily constitute a material breach sufficient to excuse the promisee from further performance.  Fitz v. Coutinho, 136 N.H. 721, 724-25 (1993).  Whether a breach is material, however, does not affect the running of the statute of limitations, provided the breach injures the plaintiff.  See 23 Richard A. Lord, Williston on Contracts § 63.3 (4th ed. 1999) ("the nonbreaching party is entitled to damages caused even by the immaterial breach").

[7]For similar reasons, the Archdiocese cannot rely on the fraudulent concealment doctrine to toll the contract claim. First, as the moving defendants point out, the Archdiocese presents no developed argument as to how the doctrine fits its breach of contract claim, but simply makes passing references to the theory.  Mem. Opp'n Mot. Dismiss at 7; Sur-Reply Mem. at 3.

<u>Ford, Inc. v. Ford Motor Co.</u>, 2001 DNH 144, 2001 WL 920035, at *6
(D.N.H. Aug. 6, 2001).

The Archdiocese further contends that Coronado's alleged
promises to pay the money due under the agreement, made
subsequent to April, 2002, also serve to toll the statute of
limitations.  As the New Hampshire Supreme Court has explained:

> The statute of limitations period may be tolled . . .
> by a party's acknowledgment of a subsisting debt with
> an admission that the party is liable and willing to
> pay.  To toll the limitations period, an acknowledgment
> of debt must be more than a recognition of debt; it
> must be an admission of liability for an unpaid debt
> that the party is then willing to pay.  Specifically,
> the admission must be direct and unqualified.

<u>A & B Lumber Co.</u>, 151 N.H. at 756 (internal quotation marks and
citations omitted).  The Archdiocese argues that, under this
doctrine, Coronado's statement "that the Archdiocese would
receive its money when the bank guaranty was negotiated" and his
"promise . . . that the money would be forthcoming," Compl. ¶ 17,
toll the limitations period on its contract claim.

In response, the moving defendants point out that these

---

Such passing references are insufficient to merit the court's
attention.  <u>See</u> <u>Higgins</u>, 194 F.3d at 260.  In any event, the
fraudulent concealment doctrine applies only "when facts
essential to the cause of action are fraudulently concealed
. . . ."  <u>Furbush v. McKittrick</u>, 149 N.H. 426, 431 (2003).  Here,
as just discussed, the Archdiocese knew the facts essential to
its breach of contract claim by April 2002, when the time for the
defendants' performance had passed without delivery of the money.
Given this knowledge, the fraudulent concealment doctrine does
not apply.  <u>See</u> <u>Premium Mgmt., Inc. v. Walker</u>, 648 F.2d 778, 783
& n.7 (1st Cir. 1981) (applying New Hampshire law).

"admissions" themselves occurred in May 2002, which is still more than three years before the Archdiocese filed suit.[8]  But "[t]he admission itself does not take the action out of the statute of limitations; rather, it is the new promise that may be inferred from that admission that removes the bar."  Soper v. Purdy, 144 N.H. 268, 270 (1999).  Accordingly, as the Archdiocese argues in its sur-reply, "the creditor's remedy on the new promise is not barred by statutory limitation until the lapse of the full period counting from the time of breach of this new promise."  3 Eric Mills Holmes, Corbin on Contracts § 9.5, at 255 (rev. ed. 1996) (emphasis added); see also Restatement (Second) of Contracts § 82 cmt. c (1981).  The Archdiocese therefore maintains that the limitations period on its contract claim did not start running until July 2002, when the Archbishop discovered that the bank guaranty was counterfeit and "that Defendants likely would not perform . . . ."  Sur-reply at 3.

     The moving defendants do not provide any authority in support of their contrary view that the limitations period on the new promises commenced at the time of their making, rather than

---

[8]Although the moving defendants cite the same passage from A & B Lumber Co., they do not question whether Coronado's statements meet the standard articulated in that case.  The court has therefore not considered that question in ruling on the motion to dismiss.

at the time of their breach.[9]  They do argue, however, that "the
alleged promises were made by Coronado, not the moving
defendants, and the Complaint fails to allege how these promises
would be binding on them."  Reply at 8.  For the purpose of
tolling the statute of limitations on a debt to the plaintiff,
"[a] new promise is only good as to the maker."  A & B Lumber
Co., 151 N.H. at 756; see also Premier Capital, Inc. v.
Gallagher, 144 N.H. 284, 287 (1999).  The Archdiocese rejoins
that the moving defendants "are bound by the acts of their
agent," Coronado, in making the claimed promises.  Sur-reply at 4
n.2.  The complaint, however, alleges that it was FMI--rather
than any of the other moving defendants--who had authorized
Coronado to act on its behalf.  Compl. ¶ 13.

Coronado's alleged promises, then, could not have bound
McCarron or Friedrich absent some basis for disregarding FMI's

_____

[9]Of course, the limitations period on the new promise will
commence at the time of its making "if the promise is immediately
performable.  If the promise is to pay at some future date or on
the performance of some condition . . . [t]he new statutory
period is counted only from the breach of the new promise."
3 Corbin, supra, § 9.10, at 280-81 (footnotes omitted); accord
Barker v. Heath, 74 N.H. 270, 272 (1907) (noting that "direct and
unqualified admission by a debtor, within six years prior to the
commencement of the action . . . will prevent the statutory bar"
but that "[i]f the admission be conditional, limited, or
qualified . . . the new promise will have a like quality, and the
statute will operate so far as it may in view of the condition,
limitation, or qualification").  The complaint alleges this
latter kind of promise--Coronado said the Archdiocese would get
its money once he negotiated the bank guaranty.

13

corporate form.  In Part II, <u>infra</u>, the court concludes that the complaint fails to allege any such basis with the requisite particularity.  Coronado's alleged promises therefore provide no basis for tolling the statute of limitations on the contract claim against McCarron, Friedrich, and Foreign Motors.  See <u>A & B Lumber Co.</u>, 151 N.H. at 757 (holding that "[m]ere receipt of the benefits of a contract does not suffice" to toll limitations period).  It is apparent from the complaint that this claim is time-barred as to these defendants.  Because the complaint states that Coronado was acting as the agent of FMI, however, his alleged promises suffice to toll the statute of limitations on the contract claim against the company itself, at least on the face of the complaint.  <u>Cf.</u> <u>A & B Lumber Co.</u>, 151 N.H. at 756; <u>Merrimack Loan Co. v. Theodorou</u>, 91 N.H. 487, 489 (1941); <u>Titus v. Annis</u>, 77 N.H. 478, 480 (1915).  The moving defendants' motion to dismiss the contract claim on limitations grounds is therefore granted as to McCarron, Friedrich, and Foreign Motors, but denied as to FMI.

     B.   <u>The Fraud Claim</u>

     Under the discovery rule, the limitations period on a fraud claim commences when the plaintiff knows, or reasonably should have known, both that the defendant has perpetrated a fraud and the plaintiff has been injured as a result.  <u>Keshishian v. CMC</u>

14

Radiologists, 142 N.H. 168, 178–79 (1997); Hamlin v. Oliver, 77
N.H. 523 (1915); see also Cheshire Med. Ctr. v. W.R. Grace & Co.,
764 F. Supp. 213, 216–17 (D.N.H. 1991).  Characterizing "[t]he
essence of the fraud" as "a 'program' by which Coronado promised
to turn a $1 million investment into $10 million 'within one
month,'" the moving defendants argue that the Archdiocese should
have realized it had been defrauded by April 2002, when Coronado
had failed to deliver on that promise.  Reply at 9.

The fraud alleged in the complaint, however, goes beyond the
mere default on the agreement to provide the $10 million within a
month of receiving the Archdiocese's contribution.  Although the
Archdiocese indeed claims that this promise was fraudulent, it
also alleges other false statements, principally Coronado's
"false excuses" for the delay, given in May 2002.  Compl. ¶ 25.
The purpose of these statements, according to the complaint, was
to conceal that the defendants had misappropriated the
Archdiocese's investment instead of multiplying it through the
touted program.  The Archdiocese argues that it could not have
uncovered this fact until July 2002, when the Archbishop learned
of the fake bank guaranty.  The court cannot conclude, based on
the complaint itself, that the Archdiocese should have known the
program was a sham any earlier, such as when the $10 million had
failed to arrive by April, 2002.  See Rodi, 389 F.3d at 17
(applying Massachusetts law).  Accordingly, because the

15

Archdiocese brought suit within three years of July 2002, the
moving defendants' motion to dismiss the fraud claim on
limitations grounds must be denied.

     C.   <u>The Conversion Claim</u>

     The moving defendants argue that the statute of limitations
on the Archdiocese's conversion claim also began running in April
2002, when the $10 million did not materialize as promised.  This
argument mistakenly equates conversion with breach of contract.
As the moving defendants recognize, "'[c]onversion is an
intentional exercise of dominion or control over a chattel which
so seriously interferes with the right of another to control it
that the actor may justly be required to pay the other the full
value of the chattel.'"  Mem. Supp. Mot. Dismiss at 6 (quoting
<u>LFC Leasing & Fin. Corp. v. Ashuelot Nat'l Bank</u>, 120 N.H. 638,
640 (1980)).  Retaining the plaintiff's property "for a
reasonable length of time" beyond the defendant's right to do so,
then, generally does not amount to conversion.  <u>LFC Leasing &
Fin. Corp.</u>, 120 N.H. at 640.

     Thus, the simple fact that the defendants did not refund the
$1 million by April 2002, the time at which the parties'
agreement called for the defendants to perform, would not have
given the Archdiocese any reason to suspect that its investment
had been converted to the defendants' own use, as it alleges.

16

Instead, as just discussed with regard to the fraud claim, the complaint indicates that the Archdiocese could not have known of the claimed conversion until July 2002 at the earliest.  Like the fraud claim, then, the Archdiocese's conversion claim is timely.  The moving defendants' motion to dismiss it is denied.

II.   Whether the Archdiocese Has Pled Fraud with Particularity

The moving defendants also seek to dismiss the Archdiocese's claims for fraud and violation of the New Hampshire and Florida consumer protection acts on the ground that the complaint does not state them with the particularity required by Rule 9(b).  The rule states, in relevant part, that "[i]n all averments of fraud . . . , the circumstances constituting fraud . . . shall be stated with particularity."  Fed. R. Civ. P. 9(b).  The moving defendants argue, and the Archdiocese does not dispute, that this requirement applies not only to its common-law fraud claim but also to its claim under the consumer protection statutes, which arises out of the defendants' alleged artifice.  See Gwyn v. Loon Mtn. Corp., 2002 DNH 100, 2002 WL 1012929, at *7 (D.N.H. May 15, 2002) (applying Rule 9(b) to claim alleging misrepresentations in violation of RSA 358-A), aff'd, 350 F.3d 212 (1st Cir. 2003); Stires v. Carnival Corp., 243 F. Supp. 2d 1313, 1322 (M.D. Fla. 2002) (applying Rule 9(b) to claim alleging fraud in violation of Fla. Stat. Ann. § 501.204).

17

Rule 9(b)'s "reference to 'circumstances constituting fraud' usually requires the claimant to allege at a minimum the identity of the person who made the fraudulent statement, the time, place, and content of the misrepresentation, the resulting injury, and the method by which the misrepresentation was communicated." 2 James Wm. Moore et al., Moore's Federal Practice § 9.03[1][b], at 9-18 (3d ed. 1997 & 2005 supp.) (footnote omitted); accord United States ex rel. Karvelas v. Melrose-Wakefield Hosp., 360 F.3d 220, 232 (1st Cir. 2004), cert. denied, 534 U.S. 820 (2004). The moving defendants argue that the complaint does not satisfy this standard because it ascribes no misrepresentations to any of them.  In this regard, they note that "[i]f a claim involves multiple defending parties, a claimant may not usually group all claimed wrongdoers together in a single set of allegations. Rather, the claimant must make specific and separate allegations against each defendant."  2 Moore, supra, § 9.03[1][f], at 9-25 (footnote omitted); see also Vicom, Inc. v. Harbridge Merchant Servs., Inc., 20 F.3d 771, 778 (7th Cir. 1994); Mills v. Polar Molecular Corp., 12 F.3d 1170, 1175 (2d Cir. 1993); In re Tyco Int'l, Ltd. Sec. Litig., 185 F. Supp. 2d 102, 114-15 (D.N.H. 2002); White v. Union Leader Corp., 2001 DNH 126, 2001 WL 821527, at *4 (D.N.H. July 13, 2001); Manchester Mfg. Acquisitions, Inc. v. Sears, Roebuck & Co., 802 F. Supp. 595, 600 (D.N.H. 1992); Shields v. Amoskeag Bank Shares, Inc., 766 F. Supp. 32, 41

18

(D.N.H. 1991), <u>rev'd on other grounds sub nom.</u> <u>Serabian v.</u>
<u>Amoskeag Bank Shares, Inc.</u>, 24 F.3d 357 (1st Cir. 1994).[10]

Although the Archdiocese points to a number of alleged
misrepresentations the complaint specifically attributes to
Coronado, it does not identify any such statements by McCarron,
Friedrich, or Foreign Motors.[11]  Instead, the Archdiocese argues
that its complaint sufficiently alleges that those defendants
participated in the fraud by withdrawing funds from FMI's account
at Granite Bank subsequent to the Archdiocese's wiring its $1
million there in March 2002.

The court disagrees.  The complaint alleges only that
"within days after the $1 million was wired into [the account],
and starting in early March of 2002, <u>the Defendants</u> proceeded to
draw down the funds in that account" and that, over the next four
months, "[t]ransfers totaling approximately $999,000 were made to

---

[10]Given this depth of authority, the Archdiocese's statement
that "[q]uite simply, there is no 'requirement' of separate
pleading" as to each defendant under Rule 9(b), Mem. Opp'n Mot.
Dismiss at 16, is incorrect.

[11]Indeed, the complaint does not appear to allege any.  The
Archdiocese claims that McCarron attended one of the meetings in
Miami between its representatives and Coronado at which the
Archdiocese agreed to hand over $500,000, but does not specify
what, if anything, McCarron did or said at that meeting.  <u>See</u>
Compl. ¶ 15.  Indeed, in its opposition to the motion to dismiss,
the Archdiocese states merely that McCarron was "present" at that
meeting.  Mem. Opp'n Mot. Dismiss at 13-14.

and by <u>Defendants</u> Coronado, McCarron, Friedrich, FM International, and Foreign Motors."  Compl. ¶ 19 (emphases added).  This statement fails to meet the standard set by Rule 9(b) that a fraud claim "inform each defendant of the nature of his alleged participation in the fraud."  <u>DiVittorio v. Equidyne Extractive Indus., Inc.</u>, 822 F.2d 1242, 1247 (2d Cir. 1987). Instead, paragraph 19 of the complaint "group[s] all claimed wrongdoers together in a single set of allegations," which is insufficient.  2 Moore, <u>supra</u>, § 9.03[1][f], at 9-25; <u>see also</u> <u>Vicom, Inc.</u>, 20 F.3d at 778 (noting that, pursuant to Rule 9(b), courts "have rejected complaints that have 'lumped together' multiple defendants"); <u>Shields</u>, 766 F. Supp. at 40.

This deficiency is not simply "a matter of semantics," as the Archdiocese suggests.  Mem. Opp'n Mot. Dismiss at 16. Rather, it cuts to the heart of the concerns justifying the heightened pleading requirement for fraud:  "'to give notice to defendants of the plaintiffs' claim, to protect defendants whose reputation may be harmed by meritless claims of fraud, to discourage 'strike suits,' and to prevent the filing of suits that simply hope to uncover relevant information during discovery.'"  <u>Karvelas</u>, 360 F.3d at 226 (quoting <u>Doyle v. Hasbro, Inc.</u>, 103 F.3d 186, 194 (1st Cir. 1996)); <u>see also</u> <u>Ackerman v. Northwestern Mut. Life Ins. Co.</u>, 172 F.3d 467, 469 (7th Cir.

1999) ("the rule requires the plaintiff to conduct a precomplaint investigation in sufficient depth to assure that the charge of fraud is responsible and supported, rather than defamatory and extortionate," since "fraud is frequently charged irresponsibly by people who have suffered a loss and want to find someone to blame for it . . . .")

The allegation that "the defendants" withdrew funds from the account where the Archdiocese had sent its money does not effect these purposes.  The complaint provides no clue as to which of the defendants might have made which withdrawals, in what amount, at what particular time, or for what purpose.[12]  As a result, paragraph 19 might allege no more than Coronado's use of the account to receive the $1 million before quickly distributing most of it to himself, while the other defendants continued using the same account for FMI's ordinary business purposes, unaware of the fact that the Archdiocese's money had passed through.  While paragraph 19 might also allege, as the Archdiocese urges, that McCarron, Friedrich, and Foreign Motors knowingly helped themselves to the money as the fruits of a scheme they abetted, it is precisely this ambiguity that makes the complaint

---

[12]Indeed, the complaint does not expressly state that McCarron, Friedrich, or Foreign Motors actually received any of the funds from the account--it alleges that the transfers "were made by and to" the defendants.

inadequate.  "Rule 9(b) is not satisfied where the complaint vaguely attributes the alleged [fraud] to 'defendants' . . . . plaintiffs also ha[ve] to allege that [each of the defendants] personally knew of, or participated in, the fraud."  <u>Mills</u>, 12 F.3d at 1175.

The Archdiocese also argues that it has sufficiently pled its fraud claims against the moving defendants through its allegation that they "voluntarily authorized Coronado to act as their agent . . . ."  Sur-reply ¶ 4.  The complaint avers that "FM International appointed . . . Coronado to be <u>its</u> exclusive legal representative," with "full authority to transact business and issue contracts <u>in the name of FM International</u>."  Compl. ¶ 13 (emphases added).  Although the moving defendants argue to the contrary, paragraph 13 of the complaint pleads the principal-agent relationship between FMI and Coronado with adequate particularity:  it states when and where this relationship was formed, its parameters, and even identifies the instrument through which it was formalized.[13]  <u>Cf.</u> <u>Kolbeck v. LIT Am., Inc.,</u>

_____

[13]The moving defendants also challenge the sufficiency of the allegation that "representatives of the Archdiocese were advised by associates of . . . Coronado that another country had decided not to enter into the 'program' and, therefore, that another $5 million was available to the [Archdiocese] if [it] could produce another $500,000."  Compl. ¶ 16.  Though the moving defendants have a point, "[w]hen a claim sounding in fraud contains a hybrid of allegations, some of which satisfy the

22

923 F. Supp. 557, 559 (S.D.N.Y. 1996), aff'd, 152 F.3d 918 (2d Cir. 1998) (unpublished).  But, as noted in Part I.A, supra, these allegations do not support the conclusion that Coronado was the agent of McCarron, Friedrich, or Foreign Motors.

Nor does the complaint sufficiently allege a basis for disregarding FMI's corporate form so as to hold McCarron and Friedrich directly liable for Coronado's actions.  The moving defendants argue, and the Archdiocese does not dispute, that Rule 9(b)'s elevated pleading requirement applies to such veil-piercing claims.  See Bd. of Trs. of Teamsters Local 863 Pension Fund v. Foodtown, Inc., 296 F.3d 164, 172-73 & n.10 (3d Cir. 2002); Soviet Pan Am Travel Effort v. Travel Comm., Inc., 756 F. Supp. 126, 132 (S.D.N.Y. 1991).  Throughout the complaint, the Archdiocese repeatedly alleges that "McCarron and Friedrich failed to follow corporate formalities, and to observe the separateness of . . . FM International" and that the "corporation existed as a sham to further the fraudulent activities of its principals . . . ."  Compl. ¶¶ 23, 27, 31, 34, 37, 41.  But "mere

strictures of Rule 9(b) and some of which do not, an inquiring court may sustain the claim on the basis of those specific allegations that are properly pleaded."  Rodi, 389 F.3d at 15-16. Because the complaint alleges other fraudulent statements by Coronado with the particularity required by Rule 9(b), its failure to meet that standard with regard to this statement does not require dismissal of the Archdiocese's fraud-based claims against FMI.

allegations of fraud . . . are too conclusional to satisfy the particularity requirement, no matter how many times such accusations are repeated." Hayduk v. Lanna, 775 F.2d 441, 444 (1st Cir. 1985).  As just discussed, the only factual support for the theory that McCarron and Friedrich employed FMI as an instrument of fraud is the inclusion of them among the "defendants" who withdrew money from the same FMI account that contained the Archdiocese's $1 million.[14]  Because the complaint provides no specific information about any of these withdrawals, however, there is no basis for concluding that McCarron or Friedrich improperly diverted any of them to his own use.  Cf. Bd. of Trs. of Teamsters, 296 F.3d at 172–73 (ruling that veil-piercing claim satisfied Rule 9(b) where plaintiffs "enumerat[ed] [defendants'] actions, consisting of diverting funds, fictitious invoices and kickbacks, inject[ing] some measure of substantiation into their allegations of fraud . . . .") (internal quotation marks omitted).

The complaint therefore fails to allege, with the specificity demanded by Rule 9(b), circumstances that would justify piercing FMI's corporate veil and holding McCarron and

---

[14]The complaint contains no additional factual support for its assertions that McCarron and Friedrich "failed to follow corporate formalities" or "to observe the separateness of FM International."

Friedrich personally liable for Coronado's alleged machinations. Because the Archdiocese has not plead fraud by McCarron, Friedrich, or Foreign Motors with the requisite particularity, both its fraud claim and its claim for violations of the consumer protection laws against those defendants must be dismissed.  The complaint, however, sufficiently states those claims against FMI itself insofar as Rule 9(b) requires.[15]

Finally, the Archdiocese argues that "if the court concludes that the allegations of fraud are somehow deficient . . . the appropriate remedy is to allow [the Archdiocese] to amend [its] complaint."  Mem. Opp'n Mot. Dismiss at 20.  If the Archdiocese wishes to seek leave to amend its complaint, it must file a

---

[15]The moving defendants argue that, aside from its failure to ascribe any particular fraudulent statements to McCarron, Friedrich, and Foreign Motors, the complaint also fails to allege other essential elements of fraud, namely scienter and reliance. They also suggest that the Archdiocese has failed to plead other elements of its claim under RSA 358-A:2, such as that the allegedly unfair or deceptive acts or practices occurred in New Hampshire.  As the Archdiocese notes, however, Rule 9(b)'s heightened pleading requirement "extends only to the particulars of the allegedly misleading statement itself.  The other elements of fraud, such as intent and knowledge, may be averred in general terms."  Rodi, 389 F.3d at 15 (citation omitted).  By the same logic, no special standard of pleading should apply to the other elements of a fraud-based consumer protection claim; the moving defendants do not provide any authority to the contrary. Applying the more relaxed standard, the court believes that the complaint adequately alleges the remaining elements of claims for fraud and violation of RSA 358-A, essentially for the reasons stated by the Archdiocese in its opposition.

separate motion to that effect.  L.R. 7.1(a)(1).  Its request for leave to amend is therefore denied without prejudice.

III.  Whether the Complaint States Replevin and Conspiracy Claims

The moving defendants also seek dismissal of Count V, which seeks "recovery under the equitable doctrine of replevin," Compl. ¶ 36 (citing Fla. Stat. Ann. § 78.01 and RSA 536-A:1), and Count VI, which alleges a conspiracy among the defendants, on the grounds that these counts fail to state a claim for relief.  The court will address these arguments in order.

The moving defendants contend that a plaintiff cannot reclaim funds, as opposed to personalty, through an action for replevin.  By their terms, both the New Hampshire and the Florida statute authorizing such actions limit them to "personal property."  RSA 536-A:1; Fla. St. Ann. § 78.01; see also 4 Richard V. Wiebusch, New Hampshire Practice: Civil Practice and Procedure § 18.01, at 430 n.1 (2d ed. 1997) ("Replevin does not lie for the recovery of money . . . ."); Williams Mgmt. Enters., Inc. v. Buonauro, 489 So. 2d 160, 168 (Fla. Dist. Ct. App. 1986) ("The action of replevin is not available to recover a sum of 'money' claimed by the plaintiff and 'possessed' by the plaintiff only in the form of 'funds' on deposit in the defendant's bank checking account.").  Because the Archdiocese seeks the recovery

26

of money, rather than personal property, its complaint fails to state a claim for replevin.[16]

Finally, the moving defendants seek dismissal of the Archdiocese's conspiracy claim on the grounds that it has "failed to state a claim for an underlying tort."  Mem. Supp. Mot. Dismiss at 12.  The Archdiocese does not contest the legal premise of this argument, i.e., "[f]or a civil conspiracy to exist, there must be an underlying tort which the alleged conspirators agreed to commit."  Univ. Sys. of N.H. v. United States Gypsum Co., 756 F. Supp. 640, 652 (D.N.H. 1991); accord Posner v. Essex Ins. Co., 178 F.3d 1209, 1217-18 (11th Cir. 1999) (applying Florida law).  Instead, the Archdiocese maintains that it has stated a claim for fraud, the tort underlying its conspiracy claim.[17]  As the court has already determined, however, the complaint fails to state a claim for fraud against

---

[16]The Archdiocese maintains that "[r]eplevin of funds . . . can be appropriate when the funds at issue are identifiable." Mem. Opp'n Mot. Dismiss at 22 (citing 66 Am. Jur. 2d Replevin § 9).  Contrary to the Archdiocese's suggestion, however, the fact that each of its deposits into FMI's account had a specific transaction number assigned to it does not make the money comprising those deposits "identifiable" so as to permit replevin.  See Williams Mgmt. Enters., 489 So. 2d at 165 ("Replevin is not a proper remedy to recover 'funds' held in an account.") (footnote omitted); 66 Am. Jur. 2d Replevin § 9.

[17]The Archdiocese does not identify any other torts which might support its conspiracy claim.

27

McCarron, Friedrich, or Foreign Motors with the necessary particularity.  Accordingly, the derivative conspiracy claim must also be dismissed.[18]   See, e.g., Sheeler v. Select Energy, 2003 DNH 132, 2003 WL 21735496, at *5 (D.N.H. July 28, 2003); Am. Ass'n of Naturopathic Physicians v. Hayhurst, 2000 DNH 205, 2000 WL 1513716, at *6 (D.N.H. Sept. 29, 2000); McNell v. Hugel, 1994 WL 264200, at *8 (D.N.H. May 16, 1994), aff'd, 77 F.3d 460 (1st Cir. 1996) (unpublished).

### Conclusion

For the foregoing reasons, the moving defendants' motion to dismiss (document no. 11) is GRANTED in part and DENIED in part. Counts I, II, and IV are dismissed as to McCarron, Friedrich, and

---

[18]Although the court has ruled that the complaint adequately pleads a claim for fraud against FMI, and nobody has contested whether it pleads such a claim against Coronado, the Archdiocese does not try to save its conspiracy claim on the basis of a conspiracy between those two defendants.  In any event, such an argument would impossibly contradict the Archdiocese's theory that Coronado was acting as FMI's agent.   See 2 William Meade Fletcher, Fletcher Cyclopedia of Private Corporations § 279, at 50–51 (rev. ed. 1998 & 2005 supp.) ("a corporation cannot conspire with an agent when that agent is acting within the scope of his or her authority") (footnote omitted).

Foreign Motors.  Counts V and VI are dismissed as to McCarron, Friedrich, Foreign Motors, and FMI.  The motion is otherwise denied.

     SO ORDERED.

                                         Joseph A. DiClerico, Jr.
                                         United States District Judge

February 23, 2006

cc:  Thomas H. Hannigan, Jr., Esquire
     Gordon J. MacDonald, Esquire
     Annmarie A. Tenn, Esquire
     Davdi A. Vicinanzo, Esquire