UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF NEW HAMPSHIRE


Archdiocese of San Salvador
and Archbishop Fernando
Saenz LaCalle

     v.                        Civil No. 05-cv-237-JD
                                    Opinion No. 2006 DNH 102

FM International, LLC et al.


O R D E R


    Through this action, the Archdiocese of San Salvador and its
Archbishop (collectively, the "Archdiocese") seek to recover more
than $1 million in disaster relief funds allegedly
misappropriated by the defendants:  FM International, LLC
("FMI"); two of its managers, Thomas D. McCarron and Gary
Friedrich; its reputed agent, Mauricio Coronado; and Foreign
Motors of Durham, Inc., another corporation formed by McCarron.[1]
McCarron, Friedrich, and Foreign Motors (collectively, the
"moving defendants") have moved to dismiss the Archdiocese's
amended complaint, filed in response to this court's previous
order dismissing portions of the original complaint in this
action.[2]  See 2006 DNH 026, 2006 WL 437493 (D.N.H. Feb. 23,

_____

    [1]Coronado, who did not respond to the original complaint,
was defaulted on October 13, 2005, and has not participated in
any of the motion practice in this case.

    [2]After receiving an extension of time to think about it, the
defendants decided not to oppose the Archdiocese's motion for
leave to file its amended complaint.  See Defs.' Notice Assent
Mot. Amend.  The Archdiocese argues that, in doing so, the moving

2006).  The Archdiocese objects to the motion to dismiss; the moving defendants have filed a reply to the objection; and the Archdiocese, with the requisite leave of court, has filed a sur-reply.[3]  The Archdiocese's request for oral argument on the motion is denied.  <u>See</u> L.R. 7.1(d) ("the court shall decide motions without oral argument").

The defendants have also moved to strike one of the allegations from the amended complaint under Rule 12(f) of the Federal Rules of Civil Procedure.  The plaintiffs object, and the defendants have filed a reply to the objection.  The plaintiffs have duly filed a sur-reply.

<u>Background</u>

With the exception of some added detail, the significance of which lies at the heart of the instant motion to dismiss, the facts alleged in the amended complaint are the same as those in its antecedent and will therefore be repeated here only to the

---

defendants "effectively waived their right to seek dismissal of [the] Amended Complaint."  Opp'n Mot. Dismiss at 3 n.2.  The Archdiocese does not provide any authority supporting its view that assenting to a motion for leave to amend a pleading effects a waiver of the right to challenge it under Rule 12.  Indeed, in expressing their assent to the motion to amend, the defendants "reserve[d] all rights with respect to objecting to the substance of the amended complaint." Defs.' Notice Assent Mot. Amend.  ¶ 3.  The Archdiocese's waiver argument is unpersuasive.

[3]FMI does not join in the instant motion to dismiss and has filed an answer to the amended complaint.

extent they are material to the pending motions.  FMI appointed
Coronado its "exclusive legal representative for all of Central
and South America, excluding Ecuador," in August 2000, and gave
him signatory power over its bank account (the "FMI account").
Am. Compl. ¶ 13.  In early 2002, Coronado told representatives of
the Archdiocese about "a program to increase the funds available
for disaster relief, including food aid, by a factor of 10"--if
the Archdiocese provided FMI with $500,000, it would receive $5
million to use in aid.  Id. ¶ 14.

On or about February 28, 2002, representatives of the
Archdiocese met with Coronado in Miami, where they agreed to wire
$500,000 to the FMI account.  The Archdiocese did so that same
day.  Also at this meeting, the "lead representative of the
Archdiocese" signed a "'Non-Circumvention & Non-Disclosure
Agreement,' written in English, which mandated secrecy," at the
urging of "the Defendants."  Am. Compl. ¶ 15.  The amended
complaint, like its predecessor, alleges that McCarron attended
this meeting.  Id.; see also Compl. ¶ 15.

In its response to an interrogatory propounded by McCarron,
however, the Archdiocese does not identify him among the
participants in the meeting of February 28, 2002.  Nor does it
place him at another alleged meeting between representatives of
the Archdiocese and Coronado's "associates" the next day, when
the Archdiocese was persuaded to wire an additional $500,000 to

the FMI account as part of the same program.  Am. Compl. ¶ 16.

Instead, the Archdiocese's interrogatory answer states that

"[s]ome time later, . . . McCarron arrived in Florida"––and not

in Miami, but in Fort Lauderdale, where he subsequently met with

some of the same people who had attended the Miami meetings.

Opp'n Mot. Strike at 4.  At this meeting, McCarron presented a

written agreement "to be signed by FM International and COMFIN,"

an organization whose relationship to this matter is unclear from

the materials presently before the court.  Id.  A representative

from each party executed the agreement, the significance of which

is also unclear at the moment.

Though the Archdiocese expected to receive the return on its

investment within a month, the funds never materialized, despite

repeated promises by Coronado during the summer of 2002 that the

Archdiocese would receive its money shortly.  The original

complaint alleged simply that "the Defendants" had begun to draw

down the funds in the FMI account "within days" of the

Archdiocese's deposits and that, over the next few months,

"[t]ransfers totaling approximately $999,000, were made to and by

. . . Coronado, McCarron, Friedrich, FM International, and

Foreign Motors" so that only about $1,000 remained in the account

by the end of July 2002.  Compl. ¶ 19.

The original complaint asserted six numbered counts against

the defendants:  (I) breach of contract, (II) fraud, (III)

4

common-law conversion and violation of Florida's "civil theft" statute, Fla. Stat. Ann. § 772.11, (IV) violations of both the Florida and New Hampshire consumer protection statutes, id. § 501.204 and N.H. Rev. Stat. Ann. ("RSA") § 358-A:2, (V) replevin, and (VI) civil conspiracy.  The original complaint also sought to pierce FMI's corporate veil to hold McCarron and Friedrich individually liable for the company's alleged wrongdoing on the grounds that they "failed to follow corporate formalities, and to observe the separateness of . . . [FMI], and because that corporation existed as a sham to further the fraudulent activities of its principals."  Compl. ¶¶ 23, 27, 31, 34, 37, 41.

In its prior order, the court dismissed the fraud and consumer protection claims as to FMI and the moving defendants because the Archdiocese had failed to plead fraud against them with particularity, 2006 WL 437493, at *7-*9, and the conspiracy claim because it could not succeed in the absence of any fraud, id. at *10.  The court ruled that the Archdiocese had not sufficiently alleged a basis for piercing FMI's corporate veil so as to attribute Coronado's fraudulent activities to the moving defendants.[4]  Id. at *9-*10.  Based on this conclusion, the court also dismissed the moving defendants from the breach of contract claim on limitations grounds, because Coronado's statements

---

[4]The court determined that the Archdiocese had sufficiently pled an agent-principal relationship between Coronado and FMI. 2006 WL 437493, at *9.

tolling the statute could bind FMI, but not its owners, in the absence of a valid veil-piercing claim.[5]  Id. at *5.  In particular, the court determined that the allegation that "the defendants" withdrew funds from the FMI account did not satisfy Rule 9(b) because it "provide[d] no clue as to which of the defendants might have made which withdrawals, in what amount, at what particular time, or for what purpose."  Id. at *10.

Through the amended complaint, the Archdiocese attempts to correct this problem by individually identifying the alleged transactions that depleted the FMI account.  First, on March 5, 2002, McCarron allegedly withdrew $500,000, from the account and deposited it into another account held jointly by him and Friedrich (the "joint account").  Although at least $475,000 was later returned to the FMI account from the joint account in the form of two large transfers, each of these transfers coincided with a transfer in the same or a similar amount from the FMI account to Coronado.[6]  Am. Compl. ¶¶ 19(j)-(k).  In addition to these transfers, Coronado also received $180,020 directly from the FMI account, id. ¶ 19(b), while $150,020 was credited to an

_____

[5]The court also dismissed count V of the original complaint, claiming replevin, on the ground that it failed to state a claim for relief.  The Archdiocese has omitted that count from its amended complaint.

[6]In July, 2002, an additional $5,381.49 from the joint account was deposited into the FMI account.  Am. Comp. ¶¶ 19(q)-(r))).  The joint account was then closed.

associate of his, Reglio Bonis, <u>id.</u> ¶ 19(g), and $7,500 was paid "to a law firm, apparently for the settlement of a delinquency incurred by Olga and Jorge Coronado, who are believed to be Coronado's parents." <u>Id.</u> ¶ 19(l). Each of these transfers was executed by McCarron.

Meanwhile, on March 6, 2002, McCarron moved $100,020 from the FMI account to an investment account he maintained. Am. Compl. ¶ 19(c). On March 20, 2002, he wrote a check on the FMI account for $2,500 to the same bank that held FMI's account; he wrote a check to different bank, also on the FMI account, for $15,000, on July 31, 2002.[7] <u>Id.</u> ¶ 19(t). McCarron also deposited $10,000 into the FMI account in the form of a personal check that same day. <u>Id.</u> ¶ 19(s).

For his part, Friedrich made two cash withdrawals from the FMI account, totaling $17,104, within two weeks of the Archdiocese's deposit. <u>Id.</u> ¶¶ 19(d)-(e). On July 16, 2002, Friedrich deposited $15,000 in funds, apparently originating from a personal account, into the FMI account, but, that same day, transferred $16,000 "into an account held in the name of Lespan SA, with a further credit to a Mondale Trading Ltd. Account." <u>Id.</u> ¶¶ 19(o)-(p). The amended complaint does not further identify these entities or their connection with Friedrich or any

---

[7]The amended complaint does not say what ultimately happened to these sums.

of the other defendants.[8]

Money also passed between FMI and Foreign Motors, or other
entities with names similar to FMI's.  McCarron wrote Foreign
Motors a check for $30,000 on FMI's account on March 20, 2002,
Am. Compl. ¶ 19(f), and, conversely, wrote FMI two checks on
Foreign Motors's account, the first for $10,000 on April 5, 2002,
and the second for $1,500 on June 24, 2002.  Id. ¶¶ 19(i), (m).
FMI also received $2,508.16 from "FM International LLC DAS" on
July 8, 2002, and $63.17 from "FM International LLC Guatemala" on
July 26, 2002.  Id. ¶¶ 19(n), (r)))).

Based on these transactions, the Archdiocese asserts that
McCarron and Friedrich "treat[ed] the account of [FMI] as their
personal bank account," removed funds from the FMI account "into
their personal accounts, for personal gain, temporarily and
permanently," used the account to pay personal expenses, and
moved money between the FMI account and Foreign Motors.  Am.
Compl. ¶¶ 22(a)-(d), 26(a)-(d), 30(a)-(d), 33(a)-(d), 37(a)-(d).
The Archdiocese therefore charges that McCarron and Friedrich
"failed to follow corporate formalities, and to observe the
separateness of [FMI] . . . ."  Id. ¶¶ 22, 26, 30, 33, 37.  The
Archdiocese also identifies the specific transfers between the

---

[8]On July 31, 2002, Friedrich deposited into the FMI account
a check McCarron had written him for $1,145.59, though the
amended complaint does not identify the account on which the
check was drawn.  Am. Compl. ¶ 19(u).

FMI account and the moving defendants' personal accounts, as well as to Coronado or those close to him, as among the fraudulent acts and unfair and deceptive practices allegedly perpetrated by the defendants.  Id. ¶¶ 24, 32.

Discussion

I.   The Motion to Strike

Pursuant to Rule 12(f) of the Federal Rules of Civil Procedure, the moving defendants seek to strike the allegation in the amended complaint that McCarron attended the February 28, 2002, meeting in Miami.  Am. Compl. ¶ 15.  Rule 12(f), in relevant part, allows the court to "order stricken from any pleading . . . any redundant, immaterial, impertinent, or scandalous matter."  The defendants suggest that the allegation is "scandalous" because it underlies the Archdiocese's fraud claim against McCarron, as to which "[t]he consequences, reputational and otherwise, are profound."  Mem. Supp. Mot. Strike at 6.  While the accusations of fraud certainly have the potential to injure McCarron's reputation, the motion to strike does not target those accusations in toto, but the narrow claim that McCarron attended the February 28 meeting.  As the court noted in its prior order, McCarron's mere presence at the meeting does not tie him to any of the allegedly fraudulent statements Coronado made there or otherwise connect him to the scheme

9

described in the complaint.  2006 WL 437493, at *7 n.11.

"Scandalous pleadings for the purpose of Rule 12(f) are those which reflect cruelly upon the defendant's moral character, use repulsive language, or detract from the dignity of the court . . . ." <u>Nault's Auto. Sales, Inc. v. Am. Honda Motor Co.</u>, 148 F.R.D. 25, 31-34 (D.N.H. 1993) (internal quotation marks omitted); <u>see also</u> 2 James Wm. Moore <u>et al.</u>, <u>Moore's Federal Practice</u> § 12.37[3], at 12-100.3--12-100.4 (3d ed. 1997 & 2005 supp.).  The allegation placing McCarron at the February 28 meeting does not approach this standard.  <u>Cf.</u> <u>Alvarado-Morales v. Digital Equip. Corp.</u>, 843 F.2d 613, 617-18 (1st Cir. 1988) (approving order striking allegations likening defendants to "Chinese communists in Korea" engaged in "brainwash" and "torture").  Although McCarron may take humbrage at the allegation, "it is not enough that the matter offends the sensibilities of the objecting party if the challenged allegations describe acts or events that are relevant to the action." <u>Gitto v. Worcester Tel. & Gazette Corp. (In re Gitto Global Corp.)</u>, 422 F.3d 1, 12 (1st Cir. 2005).

The moving defendants have not questioned the relevance of the February 28 meeting to the Archdiocese's claims.  Instead, they argue that the court should strike the allegation placing McCarron there as "patently false" in the face of the Archdiocese's interrogatory answer.  Generally, however, a

10

statement's mere falsity does not justify striking it from a
pleading; it must also fit within one of the categories of
objectionable matter enumerated by Rule 12(f).  See Boyd v.
United States, 861 F.2d 106, 109 (5th Cir. 1988); Manuel v.
Lucenti, 2004 WL 2608355, at *3 (N.D. Ill. Nov. 16, 2004);
5C Charles Alan Wright & Arthur R. Miller, Federal Practice &
Procedure § 1382, at 449 (3d ed. 2004).

This court's decisions in R & J Tool, Inc. v. Manchester
Tool Co., 2001 DNH 9, 2001 WL 274820 (D.N.H. Jan. 10, 2001), and
Berke v. Presstek, Inc., 188 F.R.D. 179 (D.N.H. 1998), cited by
the moving defendants, are not to the contrary.  While the court
in R & J Tool denied a motion to strike one of the plaintiff's
claims because the defendant "ha[d] not pointed to any evidence
in support of its view that [the] claim [was] "'false and sham,'"
the court in no way endorsed "false and sham" as a sufficient
showing for relief under Rule 12(f).  2001 DNH 9, 2001 WL 274820,
at *5; accord 5C Wright & Miller, supra, § 1383, at 472-73.  In
fact, as the court's use of quotation marks indicates, the phrase
"false and sham" was the defendant's, not the court's.[9]

In Berke, the court largely denied a motion to strike the
complaint's characterizations of a consent decree between the
Securities and Exchange Commission and one of the defendants,

---

[9]As Wright and Miller explain, while the former version of
Rule 11 authorized the striking of "sham" pleadings, Rule 12(f)
does not.  5C Wright & Miller, supra, § 1383, at 472 & n.9.

concluding that the decree was "sufficiently related to plaintiffs' claims" and that the "defendants ha[d] not shown any possible prejudice" from the references.  188 F.R.D. 180-81.  The court nevertheless struck--as "patently false"--the plaintiffs' allegations that the defendant had consented to the findings of fact set forth in the decree, which was attached to the complaint and specifically stated that the defendant had neither admitted nor denied the findings.  Id.  While this course of action arguably supports striking allegations because they are "patently false," that phrase does not aptly describe the claim here that McCarron attended the February 28 meeting, which is unsupportable only in light of the subsequent interrogatory answer.  The allegations struck from the complaint in Berke, in contrast, were directly contradicted by an exhibit attached to the complaint itself, making their falsity readily apparent, i.e., "patent."  Accord Bradley v. Chiron Corp., 136 F.3d 1317, 1324-25 (Fed. Cir. 1998) (affirming order striking allegations in second amended complaint as false because they "called into question the recitations in the first amended complaint").

Berke therefore does not support striking an allegation set forth in a pleading but later contradicted by information gleaned through discovery, as the moving defendants seek to do here.  As the Archdiocese points out, this approach "would require plaintiffs in every case to continuously seek leave to amend

their pleadings as new or contradictory facts come to light during discovery."  Opp'n Mot. Strike at 9.  Neither Rule 12(f) nor the Federal Rules of Civil Procedure in general contemplate such a requirement,[10] which would in many cases add considerably and senselessly to the expense and length of litigation.  The allegation that McCarron attended the February 28 meeting is simply not "redundant, immaterial, impertinent, or scandalous" within the meaning of Rule 12(f), nor is it "patently false" in the sense that it flatly contradicts other portions of the Archdiocese's pleadings.  Cf. Nault's Auto. Sales, 148 F.R.D. at 31-34 (striking allegations of perjury and other crimes as "not only unsubstantiated" but lacking "reasonable basis upon which such charges could be responsibly made" when brought).  The motion to strike is denied.

---

[10]In their reply memorandum, the moving defendants suggest that the Archdiocese may have violated its duty under Rule 11(b)(3) to conduct an "inquiry reasonable under the circumstances" as to the accuracy of the challenged allegation, because what happened at the February 28 meeting is "a fact uniquely known" to the Archdiocese.  Reply Mem. Opp'n Mot. Strike at 5.  The moving defendants, however, do not seek relief under Rule 11, and, in fact, concede that the rule does not require the Archdiocese to delete the offending allegation in this instance. Id. at 6.  Instead, the moving defendants argue that the Archdiocese has derogated from its "'duty under the rule not to persist with the contention'" by opposing the motion to strike it.  Id. (quoting Fed. R. Civ. P. 11 advisory committee's note (1993)).  So far as the court can tell, however, the Archdiocese has argued against striking the allegation not because of its accuracy, but because, inter alia, Rule 12(f) simply does not authorize such relief.  That argument does not amount to a violation of Rule 11--in fact, it is correct.

II.   The Motion to Dismiss

As they did in their motion to dismiss the original complaint, the moving defendants argue that the Archdiocese has failed to plead its claims for fraud with the particularity demanded by Rule 9(b) of the Federal Rules of Civil Procedure. Specifically, the moving defendants argue that the amended complaint fails to allege any particular statements by any of them which might support the Archdiocese's claims for common-law fraud and consumer protection act violations, or any basis for disregarding FMI's corporate form so as to hold the moving defendants themselves liable for Coronado's alleged wrongs. These wrongs include the promises Coronado allegedly made to the Archdiocese, during the summer of 2002, on which it relies to toll the statute of limitations on its breach of contract claim. Finally, the moving defendants argue that, once the fraud claim is dismissed, the Archdiocese's conspiracy claim cannot survive for want of an underlying tort.   The court will address these contentions in order.

A.   Whether Rule 9(b) Applies to the Archdiocese's Claims

At the outset, the Archdiocese argues that the strictures of the Rule 9(b) do not apply to its claims to pierce FMI's corporate veil or for violations of the New Hampshire and Florida

14

consumer protection statutes.  In opposing the motion to dismiss

the original complaint, however, the Archdiocese conceded that

Rule 9(b) <u>did</u> apply to those claims, and the court agreed.[11]  <u>See</u>

2006 WL 437493, at *7, *9.  Now, in opposing the instant motion

to dismiss, the Archdiocese maintains that Rule 9(b) applies only

to veil-piercing and consumer protection claims which arise out

of fraud and fraud <u>alone</u>.  According to the Archdiocese, its

veil-piercing claim <u>also</u> relies on the moving defendants' alleged

use of FMI "as a 'sham corporation' to promote injustice against

Plaintiffs by stealing their money," Opp'n Mot. Dismiss at 5 n.4,

while its consumer protection claim "alleges unfair methods of

competition, unconscionable acts or practices, and/or unfair and

deceptive acts or practices . . . , not merely fraudulent acts

alone."  <u>Id.</u> at 10 n.4.

    These strained characterizations of the Archdiocese's claims

are unconvincing.  As the circuit has made clear, "where fraud

lies at the core of the action, Rule 9(b) applies."  <u>Hayduk v.

Lanna</u>, 775 F.2d 441, 443 (1st Cir. 1985); <u>see also</u> <u>Shaw v.</u>

---

[11]In its sur-reply on the instant motion to dismiss, the
Archdiocese protests that it is "not bound" by its arguments on
the prior motion, particularly because it has since amended its
complaint.  Sur-reply at 3-4 n.2.  Whatever the merits of this
contention, the court <u>ruled</u> in the prior order that Rule 9(b)
applied to the veil-piercing and consumer protection claims, and
is therefore hesitant to revisit that ruling here.  <u>See</u>, <u>e.g.,</u>
<u>Harlow v. Children's Hosp.</u>, 432 F.3d 50, 55 (1st Cir. 2005).
Nevertheless, given the early stage of the litigation, the court
will give full consideration to the Archdiocese's new argument.

<u>Digital Equip. Corp.</u>, 82 F.3d 1194, 1223 (1st Cir. 1996) ("It is the allegation of fraud, not the title of the claim that brings the policy concerns underlying Rule 9(b) to the forefront.") (internal quotation marks, bracketing, and ellipse omitted). This principle holds even for causes of action that do not count fraud among their essential elements, so long as the plaintiff elects to "allege a unified course of fraudulent conduct and rely entirely on that course of conduct as the basis of a claim." <u>Vess v. Ciba-Geigy Corp. USA</u>, 317 F.3d 1097, 1103-04 (9th Cir. 2003) (citing <u>Shaw</u> among like authorities).

The Archdiocese has chosen that path here.  The gravamen of the amended complaint is that Coronado induced the Archdiocese to wire $1 million to the FMI account through misrepresentations about an investment program, and that these misrepresentations should be imputed to the moving defendants because they used the funds from the account to enrich themselves.  Indeed, the amended complaint itself characterizes the suit as an action "to recover funds in excess of $1.0 million that were <u>fraudulently</u> received by the Defendants from the Plaintiffs <u>on the false pretense</u> that the Defendants would return those funds to the Plaintiffs . . . ."  Am. Compl. ¶ 1 (emphases added).  Furthermore, the Archdiocese seeks to disregard FMI's corporate form on the theory that it "existed as a sham corporation to further the fraudulent activities of its principals," <u>id.</u> ¶¶ 22, 26, 30, 33, 37, and

16

alleges that the defendants committed consumer protection violations through specified "deceptive acts and practices," including Coronado's misrepresentations.[12]  Id. ¶ 32.  The veil-piercing and consumer protection claims, then, sound in fraud, triggering Rule 9(b)'s elevated pleading standard.

    B.    <u>Whether the Amended Complaint Satisfies Rule 9(b)</u>

The Archdiocese also maintains that, in any event, the expanded allegations in the amended complaint meet the requirements of the rule.  Rule 9(b) mandates that "[i]n all averments of fraud . . . , the circumstances constituting fraud . . . shall be stated with particularity."  As the court noted in its previous order, this standard "'usually requires the claimant to allege at a minimum the identity of the person who made the fraudulent statement, the time, place, and content of the misrepresentation, the resulting injury, and the method by which the misrepresentation was communicated.'"  2006 WL 437493, at *7 (quoting 2 Moore, <u>supra</u>, § 9.03[1][b], at 9–18 (footnote omitted)).  Furthermore, under Rule 9(b), "'[i]f a claim involves multiple defending parties, a claimant may not usually group all claimed wrongdoers together in a single set of allegations.

---

[12]As the moving defendants note in their reply, the amended complaint contains no allegations directed at the use of FMI to promote "injustice" or specifying any "unfair" or "unconscionable" acts or practices, apart from the fraud itself.

Rather, the claimant must make specific and separate allegations against each defendant.'"  Id. (quoting 2 Moore, supra, § 9.03[1][f], at 9-25 (footnote omitted)).

### 1.   The Veil-Piercing Claim

The moving defendants argue that the Archdiocese has failed to state a claim to disregard FMI's corporate form in accordance with Rule 9(b) because the amended complaint does not "allege with sufficient particularity that McCarron and Friedrich used FMI as an instrument of fraud on the plaintiffs."  Mem. Supp. Mot. Dismiss at 5.  As the parties recognize, in New Hampshire, "the corporate veil may be pierced by finding that the corporate identity has been used to promote an injustice or fraud on the plaintiffs."[13]  Terren v. Butler, 134 N.H. 635, 639 (1991); see also, e.g., LaMontagne Builders, Inc. v. Bowman Brook Purchase Group, 150 N.H. 270, 274 (2003); Gautschi v. Auto Body Discount Ctr., Inc., 139 N.H. 457, 462 (1995).

The Archdiocese argues that the moving defendants' alleged withdrawals and transfers from the FMI account, following the deposit of its $1 million investment there, amount to use of the

_____

[13]The parties appear to agree that the veil-piercing claim is governed by the law of New Hampshire, as the state of FMI's incorporation.  See Goya Foods, Inc. v. Unanue, 233 F.3d 38, 43 n.4 (1st Cir. 2000) (noting that state of incorporation "may well supply the presumptively applicable legal regime for veil piercing claims"); 1 William Meade Fletcher, Fletcher Cyclopedia of Private Corporations § 41.90, at 696-97 (rev. ed. 1999).

"corporate form to perpetrate fraud or injustice against
Plaintiffs, by diverting the [Archdiocese's] funds to [the moving
defendants'] own use."  Opp'n Mot. Dismiss at 6.  The moving
defendants protest that the alleged transactions fail to buttress
the veil-piercing claim because "[t]here is nothing inherently
suspect about lawful withdrawals and deposits from a bank
account."  Mem. Supp. Mot. Dismiss at 6.  In ruling on a motion
to dismiss for failure to state a claim, however, the court must
"assume the truth of all well-pleaded facts and indulge all
reasonable inferences that fit the plaintiff's stated theory of
liability."  <u>Brown v. Credit Suisse First Boston Corp. (In re
Credit Suisse First Boston Corp.)</u>, 431 F.3d 36, 45 (1st Cir.
2005) (internal quotation marks omitted).

The amended complaint alleges that, within one week of the
arrival of the Archdiocese's $1 million in the FMI account, the
moving defendants had transferred out more than $782,000,
including more than $600,000 to other accounts held personally by
them.  While they later shifted $475,000 from one of those
accounts back to FMI in the form of two large deposits, each of
those transactions coincided with a transfer of a similar amount
to Coronado, who also received $180,020, and whose associate and
parents received an additional $225,000 and change, directly from
the FMI account.

The timing, size, and circular nature of these and the other

19

alleged transactions support the inference that FMI assisted in
the fraud by serving as a vehicle for the distribution of its
proceeds among the other defendants.  These allegations therefore
suffice to state a claim for piercing the corporate veil under
New Hampshire law.  In Terren, for example, the New Hampshire
Supreme Court affirmed a verdict imposing individual liability on
two defendants who served as the sole shareholders and directors
of a corporation formed to develop a condominium project which
suffered from construction defects.  134 N.H. at 636-37.  During
the two-year period coinciding with the plaintiffs' initial
complaints over the defects, the individual defendants paid
themselves $343,585 in compensation and $335,526 in other
benefits from the corporation, leaving just $100,000 in assets.
Id.  Based in part on this evidence, the court upheld the trial
judge's finding "that the substantial depletion of corporate
assets by defendants . . . after being advised that defects
existed in the project provides a sufficient basis to find that
defendants . . . used the corporate entity to promote an
injustice and/or a fraud on the plaintiffs."  Id.

     Likewise, McCarron and Friedrich made some $999,000 in
alleged withdrawals and transfers from the FMI account to
accounts controlled or held for the benefit of themselves or
their codefendants during a six month period, leaving only $1,000
of the $1 million initially deposited by the Archdiocese.  These

20

transactions, also like those in <u>Terren</u>, occurred at a time when the moving defendants at least arguably should have known that a third party was likely to have a claim to the money.  The allegations of the amended complaint therefore adequately support the inference that FMI was "used to promote an injustice or fraud on the plaintiffs" as required to state a veil-piercing claim under New Hampshire law.[14]  <u>Terren</u>, 134 N.H. at 635; <u>see also</u> <u>Bartholomew v. Delahaye Group, Inc.</u>, 1995 WL 907897, at *11 (D.N.H. Nov. 8, 1995) (denying motion to dismiss veil-piercing claim based on allegation of commingling personal and corporate assets).  There are, of course, other reasonable inferences, such as the moving defendants' theory that they "were duped--much as the Archdiocese claims to have been--by the dishonest Coronado . . . ."  Mem. Supp. Mot. Dismiss at 6.  As just discussed, however, the court must draw all reasonable inferences from the facts alleged in favor of the Archdiocese at this stage.

---

[14]At various points in their briefing on the motion to dismiss, the moving defendants suggest that a "misrepresentation" to the plaintiff by a shareholder in the defendant entity constitutes an essential element of piercing the corporate veil. <u>See</u> Mem. Supp. Mot. Dismiss at 7; Reply at 7-8.  They do not provide any authority for this proposition, which is at odds with the flexible notion of veil-piercing developed in New Hampshire. <u>See</u>, <u>e.g.</u>, <u>Peter R. Previte, Inc. v. McAllister Florist, Inc.</u>, 113 N.H. 579, 582 (1973) (noting that court has disregarded corporate form "[i]n a variety of situations").  Whether proof of a misrepresentation is necessary to recover on the Archdiocese's claims for common-law fraud or consumer protection violations is discussed <u>infra</u> at section II.B.

Finally, the moving defendants argue that the Archdiocese has failed to state a basis for disregarding FMI's corporate form with the specificity required by Rule 9(b) because the amended complaint does not allege the purpose of any of the particular transactions.  In pressing this contention, the moving defendants rely heavily on the court's prior ruling that the original complaint failed to plead common-law fraud with the detail demanded by Rule 9(b) because it "provide[d] no clue as to which of the defendants might have made which withdrawals, in what amount, at what particular time, <u>or for what purpose</u>."  2006 WL 437493, at *10 (emphasis added).

As just discussed, however, by including the rest of the details of each transaction in its amended complaint, the Archdiocese has alleged particular facts sufficient to support the inference that their purpose was to distribute the proceeds of the claimed fraud.  Rule 9(b) demands no more.  <u>See</u>, <u>e.g.</u>, <u>Bd. of Trs. of Teamsters Local 863 Pension Fund v. Foodtown, Inc.</u>, 296 F.3d 164, 172-73 (3d Cir. 2002) (ruling that veil-piercing claim satisfied Rule 9(b) where plaintiffs "enumerat[ed] [defendants'] actions, consisting of diverting funds, fictitious invoices and kickbacks, inject[ing] some measure of substantiation into their allegations of fraud . . . .") (internal quotation marks omitted).  The amended complaint states

a claim to pierce FMI's corporate veil with the specificity
required by Rule 9(b).[15]

### 2.   The Fraud, Consumer Protection, and Conspiracy Claims

The moving defendants also assert that the amended complaint
fails to state claims for common-law fraud or violations of the
New Hampshire or Florida consumer protection acts because it does
not attribute any fraudulent statements directly to them.  The
Archdiocese rejoins that such allegations are inessential to
these claims, now that the amended complaint "adequately
specifie[s] the moving Defendants' particular role in the fraud"
through its recitation of their alleged withdrawals and transfers
from the FMI account.  Sur-reply at 4-5.

### a.   The Fraud Claim

The Archdiocese provides no authority for its view that a
party can incur liability for common-law fraud without itself
making fraudulent statements.  Generally, "[t]o establish fraud,
the plaintiff must prove that the <u>defendant</u> made a fraudulent

---

[15]As a result, the statute of limitations does not require
dismissal of the Archdiocese's breach of contract claim at this
stage, because Coronado's alleged promises, which serve to toll
the running of the limitations period, can be attributed to the
moving defendants if FMI's corporate form is disregarded.
<u>Cf.</u> 2006 WL 437493, at *5.

representation for the purpose or with the intention of causing the plaintiff to act upon it." Proctor v. Bank of N.H., N.A., 123 N.H. 395, 399 (1983) (emphasis added); see also, e.g., Alternative Sys. Concepts, Inc. v. Synopsys, Inc., 374 F.3d 23, 30 n.5 (1st Cir. 2004) (applying New Hampshire law).[16] While the Restatement of Torts extends liability for the tortious acts of another to a party who "knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself," Restatement (Second) of Torts § 876(b) (1979), the New Hampshire Supreme Court has not yet considered whether to adopt that rule. Cf. Invest Almaz v. Temple-Inland Forest Prods. Corp., 243 F.3d 57, 82-83 (1st Cir. 2001) (noting district court's prediction that New Hampshire would recognize tort of aiding and abetting breach of fiduciary duty akin to § 876(b), but not passing on correctness of prediction, which had not been appealed).

In any event, the amended complaint does not allege that the moving defendants gave Coronado "substantial assistance or encouragement" in defrauding the Archdiocese. Rather, in support

---

[16]As they did with the veil piercing claim, the parties appear to assume that New Hampshire law controls the fraud claim. The court notes that Florida law is to like effect. See Checkers Drive-In Rests., Inc. v. Tampa Checkmate Food Servs., Inc., 805 So. 2d 941, 944 (Fla. Dist. Ct. App. 2001) (reversing judgment against corporate officer on fraud claim for lack of evidence of misrepresentations attributable to him individually).

of the fraud claim, the amended complaint states that the
defendants "conspired to, and did in fact, defraud the
Plaintiffs" and that "[e]ach of the defendants participated in or
received proceeds of [the] fraudulent activity and is liable,
jointly and severally, for the fraud that was perpetrated."  Am.
Compl. ¶¶ 24-25.  These allegations suffice to state a claim for
civil conspiracy, which, as the Archdiocese recognizes "is 'a
device through which vicarious liability may be imposed upon all
who commonly plan . . . the wrongdoers' acts.'"  Opp'n Mot.
Dismiss at 11 (quoting Rice v. Wal-Mart Stores, Inc., 2003 DNH
166, 2003 WL 22240349, at *5 (D.N.H. Sept. 30, 2003)); see also
Univ. Sys. of N.H. v. United States Gypsum Co., 756 F. Supp. 640,
652 (D.N.H. 1991); Restatement (Second) of Torts § 876(a) (1979).
As just noted, however, the Archdiocese does not explain how the
moving defendants' alleged "participation" in "fraudulent
activity" could make them directly liable for fraud when they did
not themselves make any fraudulent statements.  The amended
complaint therefore fails to state a claim for common-law fraud
against any of the moving defendants.  Accordingly, the motion to
dismiss that claim as to the moving defendants is granted.


                    b.   The Consumer Protection Claims

        The Archdiocese's claims for violations of the New Hampshire


                                25

and Florida consumer protection statutes require a slightly different analysis.  The New Hampshire Supreme Court has expressly held that this state's "Consumer Protection Act does not contain a specific provision that allows individuals to be held liable for the acts of the 'corporate' entity absent application of the veil-piercing doctrine."  Unit Owners Ass'n of Summit Vista Lot 8 Condo. v. Miller, 141 N.H. 39, 44 (1996).  Based on this observation, the court in Unit Owners reversed a judgment holding a trustee individually liable under RSA 358:A-2 to plaintiffs who had bought condominiums from the trust, despite upholding the court's finding that he "materially participated in the disposition of the condominium units in his individual capacity" without disclosing what he knew about their inadequate drainage system.  Id. at 43-44.  Unit Owners thus stands in opposition to the majority rule that, "[a]s in tort law, corporate officers are liable for any unfair or deceptive practice in which they were directly involved."  Dee Pridgen, Consumer Protection and the Law § 4:39 (1986 & 2005 supp.) (footnote omitted); see also, e.g., Nader v. Citron, 360 N.E.2d 870, 875 (Mass. 1977); New York ex rel. Koppell v. Empyre Inground Pools, 642 N.Y.S.2d 344, 347 (N.Y. App. Div. 1996).

    Florida, however, follows the majority rule.  See Anden v. Litinsky, 472 So. 2d 825, 826-27 (Fla. Dist. Ct. App. 1985)

(recognizing that corporate officer could be liable under Fla. Stat. Ann. § 501.204 as "<u>direct</u> participant in the deceptive and unfair practices visited upon" plaintiffs who contracted with corporation); <u>Rollins v. Heller</u>, 454 So. 2d 580, 582 (Fla. Dist. Ct. App. 1984) (similar).  The amended complaint alleges that the moving defendants directly participated in unfair or deceptive acts or practices in violation of Fla. Stat. Ann. § 501.204 by making the series of withdrawals and transfers from the FMI account which drained it of the Archdiocese's money.  Am. Compl. ¶ 32.  These allegations therefore suffice to state a claim for consumer protection violations under the rule followed in Florida.  <u>See</u> <u>Nader</u>, 360 N.E.2d at 875 (refusing to dismiss consumer protection claim arising out of corporate officer's having "commingled and spent the plaintiff's funds" on deposit with corporation).  Furthermore, as the court has determined in assessing the veil-piercing claim, the detailed list of transactions set forth in the amended complaint pleads the Florida consumer protection claim with the requisite particularity.  <u>See</u> Part II.B.1, <u>supra</u>.

The amended complaint, however, does not state a claim against the moving defendants under RSA 358-A:2, because even a corporate officer's "material participation" in unfair or deceptive acts does not amount to a violation of the statute by

27

him personally.  <u>Unit Owners</u>, 141 N.H. at 43-44.  The motion to
dismiss Count IV of the amended complaint, asserting violations
of both the New Hampshire and Florida consumer protection acts,
is therefore granted as to the claim under RSA 358:A-2 but denied
as to the claim under Fla. Stat. Ann. § 501.204.


                    c.   <u>The Conspiracy Claim</u>

      Finally, the moving defendants argue that the Archdiocese's
conspiracy claim fails because the amended complaint fails to
state a claim for the underlying tort of fraud.  In its order on
the first motion to dismiss, the court accepted this argument,
which the Archdiocese had not contested.[17]  2006 WL 437493, at
*10.  Now, however, the Archdiocese argues that the moving
defendants can be liable for conspiring with Coronado to defraud
it even if they did not make any fraudulent statements
themselves.  Opp'n Mot. Dismiss at 11-12.  As previously noted,
this theory states a claim for civil conspiracy under New
Hampshire law.  Part II.B.2.a, <u>supra</u>; <u>see also</u> <u>Jay Edwards, Inc.
v. Baker</u>, 130 N.H. 41, 47 (1987).  And, for the reasons stated in
upholding the veil-piercing claim, the conspiracy to commit fraud
is pled with the specificity required by Rule 9(b).  The moving
defendants' motion to dismiss the conspiracy claim is denied.

_____

      [17]Instead, the Archdiocese argued only that the conspiracy
claim survived because its original complaint sufficiently stated
an underlying claim for fraud.

Conclusion

For the foregoing reasons, the moving defendants' motion to dismiss the amended complaint (document no. 38) is GRANTED as to Count II insofar as it seeks to hold them directly liable for common-law fraud and as to Count IV insofar as it asserts a violation of RSA 358:A-2.  The motion is otherwise DENIED.  The moving defendants' motion to strike (document no. 49) is DENIED.

SO ORDERED.

_____
Joseph A. DiClerico, Jr.
United States District Judge

September 7, 2006

cc:  Thomas H. Hannigan, Jr., Esquire
     Gordon J. MacDonald, Esquire
     Annmarie A. Tenn, Esquire
     David A. Vicinanzo, Esquire

29